**PAN–AMERICAN PLANT COMPANY,**
Plaintiff,

v.

**Andy MATSUI, d/b/a Andy Matsui Nursery, Defendant.**

**No. C–75–1094–CBR.**

United States District Court,
N. D. California.

July 12, 1977.

Gerald W. Palmer, Jones, Day, Reavis & Pogue, Los Angeles, Cal., for plaintiff.

John H. Boone, David M. Zeff, San Francisco, Cal., for defendant.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

This is an action brought by Pan-American Plant Company ("Pan American") alleging plant patent infringement by defendant Andy Matsui d/b/a Andy Matsui Nursery ("Matsui") in violation of the Plant Patent Act of 1930, 35 U.S.C. §§ 161–164. In his answer Matsui has denied infringement, raised thirteen affirmative defenses,[1] and counterclaimed against Pan-American alleging patent invalidity and violation of the antitrust laws. On July 21 and 23, 1976, the Court heard argument on defendant's motion for summary judgment and plaintiff's motion for partial summary judgment. On July 23, 1976, the Court denied defendant's motion for summary judgment,[2] granted plaintiff's motion to dismiss defendant's Fifth Affirmative Defense that plaintiff had failed to state a claim upon which relief can be granted, and denied without prejudice plaintiff's motion for summary judgment as to all other affirmative defenses and counterclaims.

■ On December 19, 1976, having found that certain exceptional conditions required that two of the issues in this action be referred to a special master, and the parties having consented, the Court referred to Magistrate Owen E. Woodruff, Jr., the issues of patent infringement and patent invalidity, and all discovery questions relating thereto. Magistrate Woodruff heard evidence and received exhibits during a hearing lasting approximately ten days, and, on February 11, 1977, lodged his report with the Court. After examining the testimony and exhibits adduced at the hearing and reviewing the memoranda submitted by counsel, the Court finds that, even if plaintiff's plant patent is valid, defendant has not infringed it. As a result, the Court

---

1. Matsui's first two affirmative defenses allege that plaintiff's claim is barred by laches and the doctrine of unclean hands; the third and fourth allege that plaintiff has violated the antitrust laws by conspiring to and succeeding in monopolizing the development, propagation and sale of chrysanthemums. The fifth affirmative defense alleges that plaintiff has failed to state a claim upon which relief can be granted. The sixth through thirteenth affirmative defenses allege patent invalidity for various reasons— most of which center around obviousness and lack of particularity in the patent claim.

2. Defendant moved for summary judgment on the ground that the alleged infringing plant in this case was not asexually reproduced from the patented plant. Defendant contended that the Plant Patent Act prohibits only the sale of plants grown from plant material cloned directly from the patented plant. The Court concluded that defendant's interpretation of the Plant Patent Act is incorrect, and that the Act bars the asexual reproduction and sale of any plant which is the same variety (i. e., has the same essential characteristics) as the patented plant, whether or not the infringing plant was originally cloned from the patented plant. Since plaintiff's claim of infringement will be denied on other grounds, however, there is no need to discuss the asexual reproduction question in detail.

need not now reach the question of patent validity.

Plaintiff, an Illinois corporation, is engaged in a number of segments of the business of producing and selling ornamental plants including chrysanthemums. Plaintiff breeds [3] and develops new varieties of chrysanthemum plants and produces and sells to greenhouses cuttings [4] of a number of different varieties of chrysanthemum plants that have been bred by Pan-American or by others. A "variety" of chrysanthemum plant is a group of plants which exhibit similar essential characteristics and which are distinguishable from other groups of plants by the presence of significant differences with respect to one or more such characteristics.

In April, 1971, after subjecting plant material of the existing "May Shoesmith" chrysanthemum to radiation, Robert E. Danielson, a vice-president of Pan-American, discovered what he considered to be a new variety of chrysanthemum. The new sport [5] appeared to have all the essential characteristics of the May Shoesmith, except that it had bright yellow blossoms when grown to finished flower. On August 16, 1972, Danielson filed an application with the United States Patent Office to obtain a plant patent on his discovery ("Danielson plant material"). The plant patent (No. 3486) was issued on February 19, 1974. The patent claim reads as follows:

> "A new and distinct variety of chrysanthemum plant, substantially as herein shown and described, characterized by its very large, bright yellow blooms, its excellent production of well formed flowers, flowering with a very even eleven-week response and producing very few culls."

In March of 1972, another sport or mutation of May Shoesmith ("Nakano plant material") was found by Jim Nakano of H. Nakano & Sons, a producer of cut flower chrysanthemums located in Redwood City, California. That sport was not an asexual reproduction of Danielson plant material. The sport or mutation found by Nakano also produced a bright yellow blossom when grown to finished flower. The Nakano greenhouse reproduced a number of plants from the Nakano plant material and in December, 1972, submitted cuttings of the Nakano plant material to Pan-American for its evaluation.

Pan American took a number of cuttings of the Nakano plant material and grew them together with cuttings of the Danielson plant material to make a comparative evaluation of the Nakano plant material and the Danielson plant material. Based on the observations of those trial flowerings by its employees in April and early May of 1973, Pan-American alleges that it concluded that the Danielson plant material and the Nakano plant material were the same variety.

In late May of 1973, deformities began to appear in the blossoms produced from the Danielson plant material. By the end of the growing season, the deformities appeared in 50 to 60% of the blossoms. The Nakano plant material, which was grown side by side with the Danielson plant material, on the other hand, did not develop similar defective blossoms. Pan-American experts believed that it might be possible to eliminate the defect in the Danielson plant

---

**3.** A "breeder" of chrysanthemums is a person or firm which creates or invents new varieties of chrysanthemum plants through the process of hybridizing, *i. e.*, crossing of male and female parents to derive new seedling varieties. The term also includes a person or firm who uses mutation inducing techniques such as radiation. For a detailed discussion of the chrysanthemum industry and plant patents as they relate to chrysanthemums, see *Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1350–1356, 1376–1383 (5 Cir. 1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977).

**4.** A "chrysanthemum cutting" is a reproductive part of a chrysanthemum plant. It can be part of a stem, part of the leaf or the tip of the plant. A cutting properly cared for and nurtured will produce another mature plant.

**5.** "Sport" is a general synonym for mutation, although it also has a more limited technical meaning as a mutation which first expresses itself as a bud variation. *Yoder Bros., Inc., supra*, 537 F.2d at 1351.

material through application of selection or pathological techniques, but knew that doing so would have delayed offering the variety for sale for at least two years.

Because it did not desire to delay offering the variety for sale, Pan-American decided to build up stock of the Nakano plant material and supply cuttings of that material to the trade. It thus replaced the Danielson plant material with the Nakano plant material for commercial sale. In 1973, after the Nakano plant material was offered for sale and shipments had been made, all Danielson plant material existing in the United States was destroyed. All cuttings of the chrysanthemum Bright Yellow May Shoesmith sold commercially in the United States are derived from the original Nakano plant.

The plant which Pan-American alleges infringes the Danielson patent is also a yellow mutation of the variety May Shoesmith and is called "Sunshine." Andy Matsui discovered Sunshine on or about February 8, 1972, in a large bed of May Shoesmith white standard chrysanthemums located in a Matsui greenhouse in Salinas, California. Upon discovery, Andy Matsui tagged the plant and allowed it to go to full bloom. Matsui then harvested the blooms and took the roots to a mother stock area in the Matsui Salinas greenhouse facility. The roots were replanted and Matsui took cuttings of the original plant to build up mother stock of Sunshine.

This process of taking and replanting cuttings to build up stock and grow flowers continued through to summer of 1972. By November 1972, Matsui was harvesting cut flowers from stock built up from the discovery of Sunshine. Matsui admits that it has asexually reproduced, used, and sold Sunshine since February 19, 1974.

Plaintiff alleges that defendant has infringed Plant Patent No. 3486 by asexually reproducing and selling the same *variety* of chrysanthemum as is covered by the patent.

The initial question in this action must therefore be whether Sunshine is the same variety as the Danielson plant material.[6]

For the purposes of this action, plaintiff defines a variety of chrysanthemum plant as "a group of plants which exhibit similar essential characteristics and which are distinguishable from other groups of plants by the presence of significant differences with respect to one or more of such characteristics." Plaintiff Pan-American Plant Company's Proposed Findings of Fact and Conclusions of Law 3 (lodged Jan. 31, 1977).

Both the President of Pan-American, William H. Hubbard, and the vice-president of Pan-American who discovered the Danielson plant material, Robert Danielson, have testified that resistance to disease and percentage of culls are very significant characteristics of a chrysanthemum variety. Tr. 212, 238–239, 495–496. Indeed, Congress itself singled out immunity from disease and ease of asexual reproduction as characteristics which may distinguish a new variety:

"The characteristics that may distinguish a new variety would include, among others, those of habit; *immunity from disease*; resistance to cold, drought, heat, wind, or soil conditions; color of flower, leaf, fruit, or stems; flavor; productivity, including ever-bearing qualities in case of fruits; storage qualities; perfume; form; and *ease of asexual reproduction*. Within any one of the above or other classes of characteristics the differences which would suffice to make the variety a distinct variety, will necessarily be differences of degree." S.Rep.No. 315, 71st Cong., 2d Sess. 4 (1930) (emphasis supplied).

■ It is undisputed that before Plant Patent No. 3486 was ever granted, the Danielson plant material became diseased and produced blossoms that were 50 to 60% culls.[7] It is also undisputed that the Sun-

---

6. The specification attached to Plant Patent No. 3486 makes it clear that the patented plant is the Danielson plant material.

7. To the extent that Danielson's patent claim describes his plant material as "producing very few culls," it is clearly inaccurate. This inaccuracy is especially troubling because before Plant Patent 3486 was ever granted, Pan-Amer-

shine chrysanthemum does not suffer the same problems. The Court finds that Sunshine's ability to be asexually reproduced with a far smaller percentage of culls than the Danielson plant material is a significantly different characteristic which makes it a different variety. Sunshine "is substantially different from plaintiff's patented [plant] and hence does not infringe." *Kim Bros. v. Hagler,* 276 F.2d 259, 261 (9 Cir. 1960).

The Court is not persuaded that the high percentage of culls was a temporary characteristic of the Danielson plant material. Pan-American is unable to say for certain that it could have eliminated the disease, because it destroyed *all* the Danielson plant material in the United States without even attempting to cure the defect.

■ Nor is the Nakano plant material covered by Plant Patent No. 3486. Although the Nakano plant material and Sunshine appear to be of the same variety, they both differ significantly from the patented plant material in their resistance to disease and the ease with which they may be asexually reproduced without deformities. The fact that Pan-American agreed with Nakano to distribute his plant material under the auspices of Plant Patent No. 3486 does not make the Nakano plant material the same variety as the Danielson plant material.

Indeed, there is evidence in this case that, after deformities began to appear in the Danielson plant material, even Pan-American viewed the Nakano plant material as a different variety. By letter to Jim and Kei Nakano dated June 8, 1973, G. Victor Ball, Vice-Chairman of George J. Ball, Inc., the parent of Pan-American, confirmed a proposed agreement providing for the patenting of "your yellow sport of May Shoesmith."

"The plan agreed on, in effect, provided for patenting of the variety at once, patent prepared by and paid for by Pan-American Plant Company, the patent rights to be held by Nakano. Ball would assume the full marketing responsibility, including:

"A. Propagating the variety through Pan-American Plant.

"B. Ball aggressively licensing other propagators to offer the variety to the trade, collecting royalty, etc. All licensing of other propagators worldwide through Ball.

"C. Ball assuming leadership in the promotion of the variety.

"D. Ball policing violators." Letter from G. Victor Ball to Jim and Kei Nakano, June 8, 1973.

In the course of the letter, Ball refers to the Nakano plant material as a "variety" eight different times. While the agreement was never carried out, the Court cannot ignore the significance of the proposal to patent *the Nakano plant material* shortly after Pan-American discovered deformities in the Danielson plant material. Although Ball downplayed the significance of this letter at trial, he admitted that his memory of the events which took place five years ago is hazy. Moreover, Ball's interest in a judgment in favor of Pan-American is obvious.

■ Pan-American has presented evidence that it is not unusual for propagator-distributors to replace one of their diseased commercial varieties with outside plant material. This may be true, but it has no bearing on whether the outside plant material is covered by a specific plant patent. If two plants have significantly different

ican not only knew that the Danielson plant material produced 50 to 60% culls, but the company actually destroyed all the plant material. Such a knowing inaccuracy raises the spectre of fraud and serious questions about the validity of the patent. *See Precision Co. v. Automotive Co.,* 324 U.S. 806, 818, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) ("Those who have applications pending with the Patent Office or who are parties to Patent Office proceedings have an uncompromising duty to report to it all facts concerning possible fraud or inequitableness underlying the applications in issue."). Failure to describe accurately in the patent claim the Danielson plant material's known propensity to produce culls also raises questions as to whether Pan-American's description of the patented plant was "as complete as is reasonably possible" as required by 35 U.S.C. §§ 112 and 162.

characteristics, they are two different varieties within the meaning of the Plant Patent Act. Merely distributing one under the commercial name of the other does not make them the same variety.

In accordance with Rule 32(a) of the Federal Rules of Civil Procedure, the foregoing constitutes the Court's findings of fact and conclusions of law.

Accordingly, the Court hereby finds that there is a "sufficient difference" between Sunshine and the plant material covered by Plant Patent No. 3486 to avoid infringement. *Kim Bros. v. Hagler, supra,* 276 F.2d at 262.

IT IS HEREBY ORDERED that counsel for defendant promptly prepare an appropriate judgment consistent with this Memorandum of Opinion, obtain approval of counsel for plaintiff as to form, and submit it to the Court for execution.

IT IS HEREBY FURTHER ORDERED that counsel for the parties herein shall appear before this Court at 9 A.M., July 28, 1977, for a status conference on the remaining issues.