**IMAZIO NURSERY, INC.,**
Plaintiff–Appellee,

v.

**DANIA GREENHOUSES, Defendant,**

and

**Coastal Nursery, Jess Rodrigues, and
Donna Rodrigues, Defendants–
Appellants.**

No. 94–1450.

United States Court of Appeals,
Federal Circuit.

Nov. 3, 1995.

Rehearing Denied; Suggestion for
Rehearing In Banc Declined
Jan. 23, 1996.

David A. Dillard, Christie, Parker & Hale, Pasadena, California, argued for plaintiff-appellee. With him on the brief were Vincent G. Gioia and John D. Carpenter.

Philip C. Swain, Kirkland & Ellis, Los Angeles, California, argued for defendants-appellants. With him on the brief was Jay I. Alexander, Kirkland & Ellis, Washington, D.C.

William L. LaFuze, Vinson & Elkins, L.L.P., Houston, Texas, was on the brief for Amicus Curiae, Greenleaf Nursery Company.

Before RICH, MAYER, and LOURIE, Circuit Judges.

RICH, Circuit Judge.

Coastal Nursery, Jess Rodrigues, and Donna Rodrigues (collectively, Coastal) appeal from the judgment of the United States District Court for the Northern District of California granting summary judgment of infringement of U.S. Plant Patent No. 5,336 (the '336 patent). *Imazio Nursery, Inc. v. Dania Greenhouse*, No. 92–20755 (SW) (N.D.Cal. September 2, 1993). We reverse the holding of infringement, vacate the finding of willfulness and the award of attorney fees, and remand.

## I. BACKGROUND

### A. The Patent

Bruno Imazio, the owner of Imazio Nursery, Inc. (Imazio), is the inventor of the '336 patent which is entitled "Heather Named Erica Sunset." According to the '336 patent, Mr. Imazio discovered Erica Sunset heather in 1978 "as a seedling of unknown pollen parentage growing in a cultivated field of **Erica persoluta,** the variety believed to be the seed parent, where it was noticed because of its early blooming and particularly because of its reaching full bloom, from base to tip, more than a month before the parent plant begins to bloom." It was the early blooming of the Erica Sunset, during the Christmas and Valentine's Day seasons, that distinguished the Erica Sunset from other known varieties.

The sole claim of the '336 patent recites:

A new variety of **Heather persoluta,** substantially as herein shown and described, particularly characterized by its profuse production of blooms over the entire length of the stem beginning in early December.

B. *The Litigation*

In April 1992, Imazio sued Coastal for patent infringement alleging that Coastal's "Holiday Heather" infringed the '336 patent. In December 1992, the trial court entered an order granting Imazio's motion for preliminary injunction. *Imazio Nursery, Inc. v. Dania Greenhouse,* 29 USPQ2d 1217, 1992 WL 551670 (N.D.Cal.1992). The trial court enjoined Coastal from "selling, shipping, giving away, trading or otherwise disposing of potted heather plants of the variety sold by [Coastal] as Holiday Heather." Coastal was not enjoined from selling cut flowers. *Id.* at 1222, 1992 WL 551670. Coastal appealed the entry of the preliminary injunction to this court. However, in an order dated April 22, 1993, the appeal was dismissed for failure to file a brief. *Imazio Nursery, Inc. v. Dania Greenhouses,* No. 93–1193 (Fed.Cir. Apr. 22, 1993).

On September 2, 1993 the district court granted Imazio's motion for summary judgment of infringement, denied its summary judgment motion on the issue of validity, and denied its motion for a permanent injunction.

The issues of patent validity, willful infringement, and damages were subsequently tried to a jury. The jury found the '336 patent not to have been proven invalid, found Coastal's infringement to have been willful, and determined actual damages of $101,-279.20. The district court entered final judgment on June 29, 1994, finding the case to be exceptional within the meaning of 35 U.S.C. § 285 (1988) and awarding attorney fees of $363,140.59 to Imazio for a total award of $464,419.79 plus pre-judgment interest. Coastal appealed to this court from the grant of summary judgment of plant patent infringement. We have jurisdiction under 28 U.S.C. § 1295(a)(1) (1988).

## II. *SUMMARY JUDGMENT*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). "In ruling on a motion for summary judgment, the district court is required to view the evidence in a light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party." *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.,* 911 F.2d 670, 672, 15 USPQ2d 1540, 1542 (Fed.Cir.1990).

We review *de novo* a district court's grant of summary judgment. *Conroy v. Reebok Int'l Ltd.,* 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994). A district court's decision on summary judgment "must be overturned if the court engaged in a faulty analysis in applying the law to the facts and a correct application of the law to those facts might bring a different result." *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 164, 225 USPQ 34, 38 (Fed.Cir. 1985).

## III. *PLANT PATENTS*

At least as early as 1892, legislation was proposed to grant patent rights for plant-related inventions. H.R.Rep. No. 5435, 52d Cong., 1st Sess. (1892). Plant patent legislation was supported by such prominent individuals as Thomas Edison who stated that "[n]othing that Congress could do to help farming would be of greater value and permanence than to give to the plant breeder the same status as the mechanical and chemical inventors now have through the law." S.Rep. No. 315, 71st Cong., 2d Sess. 3 (1930) (Senate Report). It was also supported by Luther Burbank, a leading plant breeder of the day,[1] whose widow stated that her late husband "said repeatedly that until Government made some such provision [for plant patent protection] the incentive to create work with plants was slight and independent

---

1. Luther Burbank experimented with thousands of plant varieties and developed many new ones, including new varieties of prunes, plums, raspberries, blackberries, apples, peaches, and nectarines. Besides the Burbank potato, he produced new tomato, corn, squash, pea, and asparagus forms, a spineless cactus useful in cattle feeding, and many new flowers, especially lilies and the famous Shasta daisy. *The New Columbia Encyclopedia* 396 (1975).

research and breeding would be discouraged to the great detriment of horticulture." H.R.Rep. No. 1129, 71st Cong., 2d Sess. 4 (1930) (House Report).

The Townsend–Purnell Plant Patent Act was passed by Congress on May 13, 1930 and was signed by President Hoover on May 23, 1930. It was the first legislation anywhere in the world to grant patent rights to plant breeders [2] and was enacted to "afford agriculture, so far as practicable, the same opportunity to participate in the benefits of the patent system as has been given to industry, and thus assist in placing agriculture on a basis of economic equality with industry." Senate Report at 3.

Before enactment of the Plant Patent Act, two factors were thought to prevent plants from being patentable subject matter. The first was the belief that plants, even those bred by man, were products of nature and therefore not subject to patent protection. The second factor was that plants were not considered amenable to the "written description" requirement of the predecessor of 35 U.S.C. § 112, first paragraph.[3] In promulgating the Plant Patent Act, Congress addressed both concerns. It explained that the work of the plant breeder "in aid of nature" was subject to patent protection. Additionally, the written description requirement, applicable to utility patents, was relaxed in favor of a "description ... as complete as is reasonably possible." 35 U.S.C. § 162 (1988); see also Diamond v. Chakrabarty, 447 U.S. 303, 312, 100 S.Ct. 2204, 2209, 65 L.Ed.2d 144 (1980); Ex Parte Hibberd, 227 USPQ 443 (PTO Bd.App. & Int.1985).

As originally enacted, the provisions for plant patent protection were made as amendments to the general patent law. Specifically, section 4884 of the Revised Statutes was amended to recite:

Every patent shall contain ... a grant to the patentee ... of the exclusive right to make, use, and vend the invention or discovery (including in the case of a plant patent the exclusive right to asexually reproduce the plant ).

Rev.Stat. § 4884, as amended by Act of May 23, 1930, ch. 312, § 1, 46 Stat. 376 (current version at 35 U.S.C. § 163 (1988)) (emphasis added).

Similarly, section 4886 of the Revised Statutes was amended to recite:

Any person who has invented or discovered any new and useful art, machine ... or who has invented or discovered and asexually reproduced any distinct and new variety of plant other than a tuber-propagated plant, ... may ... obtain a patent therefor.

Rev.Stat. § 4884, as amended by Act of May 23, 1930, ch. 312, § 1, 46 Stat. 376 (current version split between 35 U.S.C. §§ 101 and 161 (1988)) (emphasis added).

With the promulgation of the 1952 Patent Act, the plant patent provisions were included as a separate chapter of the statute. Act of July 19, 1952, ch. 950, 66 Stat. 804 (current plant patent provisions at 35 U.S.C. §§ 161–164 (1988)). Additionally, as was done for utility patents in 35 U.S.C. § 154(a)(1) (1988), the plant patent grant was changed from the "exclusive right" to the "right to exclude" following court decisions explaining the nature of the right conferred by a patent. 35 U.S.C. § 163 (1988); see Crown Die & Tool Co. v. Nye Tool & Mach. Works, 261 U.S. 24, 34, 43 S.Ct. 254, 256, 67 L.Ed. 516 (1923) ("All that the Government grants and protects is the power to exclude others from making, using or vending during the grant."); P.J. Federico, Commentary on the New Patent Act, 35 U.S.C.A. 1, 40–41 (1954), reprinted in 75 J.Pat. & Trademark Off. Soc'y 161, 202 (1993); Giles S. Rich, Address to the New York Patent Law Association Meeting of Nov. 6, 1952, 14–15 ("A change was made, however, in Section 163, where the plant patent right is expressed as the right to exclude.").

It should be noted that although the plant patent provisions were separated from the utility patent provisions with the enactment

2. Robert S. Allyn, The First Plant Patents 10 (1934).

3. Section 112 states in part that "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it." 35 U.S.C. § 112 (1988).

of the 1952 Patent Act, the statute explicitly states that "[t]he provisions of this title relating to patents for inventions shall apply to patents for plants, except as otherwise provided." 35 U.S.C. § 161. Thus, section 161 "engrafts the Plant Patent Act onto the basic patent law, which requires us to apply thereto all the rules, regulations, and provisions of the basic patent law," except as otherwise provided.[4] *In re LeGrice,* 301 F.2d 929, 933, 133 USPQ 365, 369 (CCPA 1962); 37 C.F.R. § 1.161 (1994).

The specification of a plant patent application must contain as full and complete a disclosure as possible of the plant and the characteristics thereof that distinguish it from related known varieties and must particularly point out where and in what manner the variety of plant has been asexually reproduced. 37 C.F.R. § 1.163(a). Only a single claim is permitted in a plant patent. 37 C.F.R. § 1.164; *Manual of Patent Examining Procedure (MPEP)* § 1605 (Rev. 14, Nov. 1992) ("A plant patent is granted only on the entire plant. It therefore follows that only one claim is necessary and only one is permitted."); *Kim Bros. v. Hagler,* 167 F.Supp. 665, 120 USPQ 210 (S.D.Cal.1958).

The only amendment to the plant patent provisions since enactment of the 1952 Patent Act came in 1954 when section 161 was amended to preclude patent protection for plants found in an uncultivated state, thereby broadening the statute to include plants found in a cultivated state and subsequently asexually reproduced. Act of Sept. 3, 1954, Pub.L. No. 83–775, 68 Stat. 1190.

Currently, chapter 15 of title 35 of the United States Code includes the following provisions:

35 U.S.C. § 161, entitled "Patents for Plants," states:

Whoever invents or discovers and asexually reproduces any distinct and new variety of plant, including cultivated spores, mutants, hybrids, and newly found seedlings, other than a tuber propagated plant or a plant found in an uncultivated state, may obtain a patent therefor.

The provisions of this title relating to patents for inventions shall apply to patents for plants, except as otherwise provided. 35 U.S.C. § 163, entitled "Grant," states:

In the case of a plant patent the grant shall be of the right to exclude others from asexually reproducing the plant or selling or using the plant so reproduced.

## IV. STATUTORY CONSTRUCTION

### A. Standard of Review

 We review issues of statutory interpretation under a *de novo* standard of review. *Kane v. United States,* 43 F.3d 1446, 1448 (Fed.Cir.1994). We need not defer to the trial court. *Chaparral Steel Co. v. United States,* 901 F.2d 1097, 1100, 8 Fed.Cir. (T) 101, 105 (1990). When interpreting statutes, a court looks to the language of the statute and construes it according to the traditional tools of statutory construction, including certain well-known canons of statutory construction. *Markman v. Westview,* 52 F.3d 967, 987, 34 USPQ2d 1321, 1336 (Fed.Cir.1995) (in banc) (citing *United States v. Grimberg,* 702 F.2d 1362, 1365 (Fed.Cir.1983) (in banc)), *cert. granted,* —— U.S. ——, 116 S.Ct. 40, 132 L.Ed.2d 921 (1995).

### B. Scope of a Plant Patent

 We first consider the scope of protection of plant patents. We begin by interpreting the relevant statutory provisions. Statutes *in pari materia* are to be construed together. *Selfway, Inc. v. Travelers Petroleum, Inc.,* 579 F.2d 75, 80, 198 USPQ 271, 275 (CCPA 1978); *see* 2 Sutherland & Lewis, Statutory Construction § 344 (1904) ("It is an elementary rule of construction that all the parts of an act relating to the same subject should be considered together, and not each by itself.").

### 1. The meaning of the term "variety"

 The parties dispute the meaning of the term "variety" in section 161. The meaning of that term may inform the scope of

---

**4.** For instance, by the express provision of 35 U.S.C. § 162 (1988), a plant patent cannot be declared invalid for noncompliance with 35 U.S.C. § 112 if its description "is as complete as is reasonably possible."

protection of plant patents inasmuch as such patents are granted to "[w]hoever invents or discovers and asexually reproduces any distinct and new *variety* of plant." 35 U.S.C. § 161 (emphasis added). Imazio argues that in providing plant patent protection for "any distinct and new variety of plant," it was intended that a plant patent cover "all plants of that new and distinct variety, i.e., all plants having the same essential and distinctive characteristics." Thus, argues Imazio, "variety" should be construed in its technical, taxonomical sense and should be interpreted to encompass more than just clones of a single plant. Coastal, on the other hand, contends that "variety" should be construed in the vernacular sense as "something different from others of the same general kind." Coastal maintains that by use of the term "variety" Congress did not intend to afford plant patent protection to a range of plants but intended only to protect a single plant.

The Plant Patent Act does not define "variety." However, the legislative history of the Plant Patent Act states:

new and distinct varieties fall into three classes—sports, mutants, and hybrids. In the first class of cases, the sports, the new and distinct variety results from bud variation and not seed variation. A plant or portion of a plant may suddenly assume an appearance or character distinct from that which normally characterizes the variety or species. In the second class of cases, the mutants, the new and distinct variety results from seedling variation by self pollenization of species. In the third class of cases, the hybrids, the new and distinct variety results from seedlings of cross pollenization of two species, two varieties, or a species and a variety.

Senate Report at 3.

Thus, upon passage of the Plant Patent Act, a patentable variety could be either a sport, mutant, or hybrid. In addition, by amendment in 1954, Congress added another class of plants, newly found seedlings, subject to the exception that such seedlings found in an uncultivated state cannot be patented. Act of Sept. 3, 1954, Pub.L. No. 83–775, 68 Stat. 1190; *see Ex parte Moore,* 115 USPQ 145 (Pat.Off.Bd.App.1957) (Section 161, as amended September 3, 1954, was intended to include "cultivated sports, mutants, hybrids, and newly found seedlings.").

Section 161 also requires that a patentable variety be new. Additionally, the variety must be distinct. As to this requirement, the legislative history states that

[i]n order for the new variety to be distinct it must have characteristics clearly distinguishable from those of existing varieties.... The characteristics that may distinguish a new variety would include, among others, those of habit; immunity from disease; resistance to cold, drought, heat, wind, or soil conditions; color of flower, leaf, fruit, or stems; flavor; productivity, including ever-bearing qualities in case of fruits; storage qualities; perfume; form; and ease of asexual reproduction. Within any one of the above or other classes of characteristics the differences which would suffice to make the variety a distinct variety, will necessarily be differences of degree.

Senate Report at 4.

The legislative history is clear that Congress intended that distinct and new cultivated sports, mutants, hybrids, and newly found seedlings be entitled to plant patent protection.

Although the legislative history does not answer the question of what "variety" means in terms of whether a single plant or a range of plants is protected by a plant patent, in addition to being distinct and new, a patentable plant must also be asexually reproduced. 35 U.S.C. § 161; *see Yoder Bros., Inc. v. California–Florida Plant Corp.,* 537 F.2d 1347, 1377, 193 USPQ 264, 291 (5th Cir.1976) ("For plant patents ... the additional requirement of asexual reproduction is introduced."), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977); Senate Report at 5 ("It is not only necessary that the new and distinct variety of plant shall have been invented or discovered, but it is also necessary that it shall have been asexually reproduced prior to the application for patent."). As discussed below, this additional requirement informs the scope of protection of plant

patents and hence directs the meaning of "variety" in § 161.

### 2. The significance of the asexual reproduction requirement

The legislative history defines asexual reproduction as reproduction by "grafting, budding, cuttings, layering, division, and the like, but not by seeds." Senate Report at 1; see MPEP § 1601.

> The legislative history further states that [w]hether the new variety is a sport, mutant, or hybrid, the patent right granted is a right to propagate the new variety by asexual reproduction.[5] It does not include the right to propagate by seeds. This limitation in the right granted recognizes a practical situation and *greatly narrows the scope of the bill.* Whether the new variety is a hybrid, mutant or sport, there is *never more than one specimen of it produced except through asexual reproduction.* For example, without asexual reproduction there would have been *but one* true McIntosh or Greening apple tree. These *varieties* of apples could not have been preserved had it not been through human effort in the asexual reproduction of the two original trees. They could not have been reproduced true to the type by nature through seedlings.

Senate Report at 4 (emphasis added) (footnote added).

The legislative history additionally sets forth that plants sought to be patented

> must be asexually reproduced in order to have their identity preserved. This is necessary since seedlings either of chance or self-pollenization from any of these would not preserve the character of the individual.

Senate Report at 3.

■ It is clear from the legislative history that as a result of the asexual reproduction requirement, only a single plant, i.e., reproduction from one original specimen in the words of Congress, is protected by a plant patent. At the time of enactment, Congress recognized that the asexual reproduction prerequisite greatly narrowed the scope of protection of plant patents but found such a limitation necessary to ensure that the characteristics of the plant to be patented were maintained. Additionally, it has since been recognized that as intimated by Congress, asexual reproduction confirms the existence of a new variety by separating variations resulting from fluctuations in environmental conditions from true plant variations. Kenneth J. Burchfiel, *Biotechnology and the Federal Circuit* 407 (1995); *Dunn v. Ragin,* 50 USPQ 472, 475 (Pat.Off.Bd.Interf. Ex'rs 1941). The Supreme Court also recognized the significance of the asexual reproduction requirement of the Plant Patent Act. In *Diamond v. Chakrabarty,* the Court indicated that asexual reproduction was required in the Plant Patent Act because it was believed that new varieties could not be reproduced true-to-type through seed. 447 U.S. at 312, 100 S.Ct. at 2209.

Though there is a paucity of case law on this point,[6] the requirement and effect of asexual reproduction as a prerequisite to plant patent protection has been recognized by the courts and the Patent Office. *Yoder,* 537 F.2d at 1380, 193 USPQ at 293 ("Asexual reproduction is the heart of the present plant patent system: the whole key to the 'invention' of a new plant is the discovery of new traits *plus* the foresight and appreciation to take the step of asexual reproduction.") (emphasis in original); *In re LeGrice,* 301 F.2d 929, 937, 133 USPQ 365, 372 (CCPA 1962) ("In 'asexual propagation,' ... the plant is propagated by divisions or cuttings to form clones, each of which is identical to the parent plant and to all other cuttings or clones taken from the parent." (citing Samuel L. Emsweller, *Fundamentals in Plant Breeding,* Plants and Gardens, Summer 1959)); *see also Dunn v. Ragin,* 50 USPQ at

---

**5.** As noted above, when the 1952 Patent Act was enacted, the right to asexually reproduce was amended to the right to exclude others from asexually reproducing. No "right to propagate" is granted by the patent. *See* 35 U.S.C. § 163.

**6.** "In many areas relating to plant patents, one writes on virtually a clean slate." Kenneth J. Burchfiel, *Biotechnology and the Federal Circuit* 408 (1995).

474; *Ex parte Moore*, 115 USPQ 145 (Pat. Off.Bd.App.1957).

The commentators have also identified the importance of the asexual reproduction requirement. 1 Donald S. Chisum, *Patents* § 1.05[1][b][ii] (1986) ("Asexual reproduction is of central importance throughout the plant patent act."). The significance of the asexual reproduction requirement has also been appreciated. Edward A. Hayman, *Botanical Plant Patent Law*, 11 Cleveland–Marshall L.Rev. 430, 433 (1962) ("It would seem that a plant patent only protects the clones, or in other words, the asexual progeny of a particular plant."); Robert S. Allyn, *The First Plant Patents* 28 (1934) ("The fact that the Commissioner of Patents has ruled that only a single claim will be permitted in these plant patents indicated that he regards the protection intended by the Statute as limited to the exact variety described."); Robert S. Allyn, *Plant Patents 1934–1943* at 12 (1944) ("From a study of the plant patents thus far issued I have reached the conclusion that regardless of the intent of the law—most plant patents if sustained at all by the Courts will be considered as covering only plants which have been asexually reproduced from the original plant."); Peter F. Langrock, *Plant Patents—Biological Necessities in Infringement Suits*, 41 J.Pat.Off. Soc'y 787, 787 (1959) ("What constitutes asexual reproduction, this semi-sacred word in the field of plant patents? There are several specific methods. Each one of these methods consists of the isolation of a group or mass of vegetative cells from the parent plant that are capable of reproducing a plant that is genetically an *exact duplication of its parent plant*. In asexual reproduction, as the cells are separated from the parent plant without any internal change, they will reproduce an *exact replica of the parent*.") (emphasis added).

■ Due to the asexual reproduction prerequisite, plant patents cover a single plant and its asexually reproduced progeny. *See* Senate Report at 6 (Plant patent protection encourages "those who own the single specimen to reproduce it asexually and create an adequate supply."). Thus, the term "variety" in section 161 must be interpreted consistently with this requirement. Accordingly, "variety" in section 161 cannot be read as affording plant patent protection to a range of plants, as asserted by Imazio.

### 3. Comparison with the Plant Variety Protection Act

■ Both parties argue that the provisions of the Plant Variety Protection Act are relevant to a proper interpretation of the scope of protection afforded plant patents under the Plant Patent Act.

The Plant Variety Protection Act of 1970 (PVPA) provides "patent-like protection to novel varieties of sexually reproduced plants (that is, plants grown from seed), which parallels the protection afforded asexually reproduced plant varieties (that is, varieties reproduced by propagation or grafting) under Chapter 15 of the Patent Act." *Asgrow Seed Co. v. Winterboer*, — U.S. —, —, 115 S.Ct. 788, 790, 130 L.Ed.2d 682 (1995). Under the PVPA, the U.S. Department of Agriculture issues certificates of plant variety protection to the "breeder of any novel variety of sexually reproduced plant (other than fungi, bacteria, or first-generation hybrids) who has so reproduced the variety." 7 U.S.C. § 2402(a) (1994).

The term "variety" is defined in the PVPA at 7 U.S.C. § 2401(a)(9) (1994) as follows:

> The term "variety" means a plant grouping within a single botanical taxon of the lowest known rank, that, without regard to whether the conditions for plant variety protection are fully met, can be defined by the expression of the characteristics resulting from a given genotype or combination of genotypes, distinguished from any other plant grouping by the expression of at least one characteristic and considered as a unit with regard to the suitability of the plant grouping for being propagated unchanged. A variety may be protected by seed, transplants, plants, tubers, tissue culture plantlets and other matter.

According to the legislative history, the 1994 amendments to the PVPA were made to conform the statute with the International Convention for the Protection of New Varieties of Plants of March 1991. H.R.Rep. No.

2927, 103d Cong., 1st Sess. 6377 (1994). There is no indication in the legislative history that the addition of a definition of the term "variety" was in any sense intended to change the scope of protection afforded under the PVPA. In fact, both before and after the 1994 amendments, the right to protection under the PVPA is based on a determination of whether the variety is new, distinct, uniform, and stable. 7 U.S.C. § 2402(a).

Imazio argues that because the Plant Patent Act and the PVPA both use the term "variety," that term must be interpreted in the same manner in both statutes. As such, according to Imazio, the term variety can only mean a group of plants that have the same essential and distinctive characteristics under the Plant Patent Act because that is how the term is defined under the PVPA. We disagree.

■ Where Congress uses the same form of statutory language in different statutes having the same general purpose, courts presume that Congress intended the same interpretation to apply in both instances. *Northcross v. Board of Educ.*, 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48 (1973). It is true that both the Plant Patent Act and the PVPA use the term "variety" and grant some form of intellectual property protection. However, the two statutes differ significantly in their purposes. The Plant Patent Act grants a plant patent to one who "invents or discovers and asexually reproduces any distinct and new variety of plant." 35 U.S.C. § 161. Conversely, one is entitled to plant variety protection under the PVPA if he has sexually reproduced the variety and has otherwise met the requirements of 7 U.S.C. § 2402(a). The term "variety" in both statutes cannot be read divorced from the very different circumstances in which that term is used.

■ Those circumstances, asexual reproduction in the case of plant patents, and sexual reproduction in the case of plant variety protection, mandate the protection afforded under these different statutory provisions. Asexual reproduction is the cornerstone of plant patent protection, while sexual reproduction is the distinguishing feature of plant variety protection. Indeed, this is why the PVPA was enacted, to afford protection for sexually reproduced plants. *Diamond v. Chakrabarty*, 447 U.S. 303, 313, 100 S.Ct. 2204, 2209–10, 65 L.Ed.2d 144 (1980). The result of asexual reproduction is a plant that is genetically identical to its parent. *Yoder*, 537 F.2d at 1380, 193 USPQ at 293 ("Asexual reproduction is literally the only way that a breeder can be sure that he has reproduced a plant identical in every respect to the parent."); *LeGrice*, 301 F.2d at 937, 133 USPQ at 372. The result of sexual reproduction is a plant that combines the characteristics of the parents, but is a different plant. *Id.* (In sexual reproduction, "the parent plants each contribute to the formation of the embryo that will develop in the seed and eventually give rise to a plant that differs from either of the parent plants as well as from other plants produced from other seeds resulting from the cross-pollination.") [7]

It follows from this that the scope of protection afforded as a result of sexual versus asexual reproduction must be different; in the case of asexual reproduction, the same plant is produced, but in the case of sexual reproduction, a different plant, albeit like the parent plants, is produced. Given this, we reject Imazio's contention that the meaning of variety in the Plant Patent Act and the PVPA must be the same.

### 4. Conclusion

■ In view of the statutory language, the legislative history, the case law, the views of the commentators, and a review of relevant provisions of the PVPA, we conclude that the scope of a plant patent is the asexual progeny of the patented plant variety. Variety as used in section 161 encompasses a single plant, the plant shown and described in the specification.

## V. INFRINGEMENT

### A. The Trial Court's Analysis

In issuing its December 1992 preliminary injunction order, the trial court adopted the

---

**7.** Plants true-to-type, although different in a strict genetic sense, are protectable under the PVPA. *Chakrabarty*, 447 U.S. at 312, 100 S.Ct. at 2209.

standard set forth in *Pan–American Plant Co. v. Matsui*, 433 F.Supp. 693, 694 n. 2, 198 USPQ 462, 463 n. 2 (N.D.Cal.1977) that the Plant Patent Act "bars the asexual reproduction and sale of any plant which is the same variety (i.e., has the same essential characteristics) as the patented plant, whether or not the infringing plant was originally cloned from the patented plant." *Imazio*, 29 USPQ2d at 1219, 1992 WL 551670. The district court also addressed whether independent creation could be a defense to plant patent infringement as discussed in *Yoder*, 537 F.2d 1347, 193 USPQ 264. The district court stated that "independent creation is [not] a proper defense to patent infringement" and asserted that "the courts' recognition of an independent creation defense would inadvertently entice deliberate infringement, with a fraudulent defense of independent creation asserted." *Id.*

In granting summary judgment of infringement in September 1993, the trial court reiterated its adoption of the standard for plant patent infringement set forth in *Pan–American*. The trial court also reiterated its refusal to recognize independent creation as a defense to plant patent infringement concluding that such a defense "would result in a deluge of litigation without contributing any necessary safeguards."

On the merits of the infringement charge, the trial court reviewed the testimony of both parties' experts and found that the "undisputed evidence thus shows that the patented Erica Sunset heather and the Holiday Heather are the same plants both morphologically (internal and external characteristics) and phenologically (blooming cycle)." The trial court concluded that Imazio had "successfully demonstrated that the Holiday Heather is an asexual reproduction of the Erica Sunset."

### B. *The Law of Infringement*

■■■ Determining infringement is a two-step process. The first step is to determine the meaning and scope of the patent claim asserted to be infringed. *Markman*, 52 F.3d at 976, 34 USPQ2d at 1326. The second step is to compare the properly construed claim to that which is asserted to infringe. *Id.* We review claim construction,

a question of law, *de novo.* *Id.* 52 F.3d at 979, 34 USPQ2d at 1329.

### C. *Infringement of a Plant Patent*

As to the first step, consistent with our analysis above, the scope of the claim of the '336 patent is the *asexual progeny* of the Heather persoluta shown and described in the '336 patent specification. To perform the second step of the infringement analysis, we first look to the language of the statute.

■■■ Section 163 grants to plant patentees the right to exclude others from asexually reproducing the plant or selling or using the plant so reproduced. 35 U.S.C. § 163. As stated above, the trial court held that asexual reproduction is shown if the patentee can prove that the alleged infringing plant has the same essential characteristics as the patented plant. We disagree.

We note that the trial court based its infringement analysis on a footnote in *Pan–American* which is dictum because in that case infringement was denied on other grounds. Additionally, the *Pan–American* court expressly stated that "there [was] no need to discuss the asexual reproduction question in detail." *Id.*

The "asexual reproduction question," however, is critical to the infringement analysis. In construing section 161, we held above that the scope of a plant patent is the asexual reproduction of the plant shown and described in the specification. Asexual reproduction, in terms of section 161, means the progeny of the patented plant via "grafting, budding, cuttings, layering, division and the like, but not by seeds." Senate Report at 1; *see MPEP* § 1601.

■■■ We must construe the term "asexual reproduction" in section 163 in the same way as we did in section 161. Thus, for purposes of plant patent infringement, the patentee must prove that the alleged infringing plant is an asexual reproduction, that is, that it is the progeny of the patented plant. *Yoder*, 537 F.2d at 1380, 193 USPQ at 293 ("It is quite possible that infringement of a plant patent would occur only if stock obtained is

used, given the extreme unlikelihood that any other plant could actually infringe.").

Our interpretation of section 163 is in accord with the majority of the commentators who have considered this issue. 1 Donald S. Chisum, *Patents* § 1.05[1][d] (1994). ("It is generally assumed that one infringes only if the accused plant is a direct or indirect asexual reproduction of the patentee's original parent plant."); Peter F. Langrock, *Plant Patents—Biological Necessities in Infringement Suits*, 41 J.Pat.Off. Soc'y 787, 788–89 (1959) ("What test is to be used in [plant patent] infringement proceedings ...? It is necessary that there be some sort of physical appropriation from one of the patent plants. It is only when there is such a physical appropriation that the rights of the patentee are invaded.... The test set out by [another] calling for only a showing of an asexual reproduction of 'substantially the same plant' misses the narrow confinement of the protection afforded to plant patents." (footnotes omitted)); David B. Bernstein, *Is a Plant Patent a Form of Copyright?*, 27 IDEA 31, 35 (1986) ("The relevant court holdings have suggested that no infringement of a plant patent can occur without an actual, physical taking from the plant discovered by the patentee.").

### 1. *Independent creation as a defense to plant patent infringement*

Below, the parties disputed whether independent creation is a proper defense to plant patent infringement. The trial court refused to recognize such a defense stating that the "patent holder would have great difficulties enforcing his patent rights if a defendant were allowed to raise independent creation as an affirmative defense." The trial court reasoned that it would be hard for the patentee to refute evidence of independent creation because all such evidence would be in the defendant's control.

■ We must reject the trial court's analysis of the independent creation defense because it is contrary to the plain meaning of the statute. *See Wilner v. United States*, 24 F.3d 1397, 1402 (Fed.Cir.1994) (in banc) (court's approach constituted legal error because it was contrary to the plain meaning of the statute). The statute requires asexual reproduction of the patented plant for there to be infringement. It is necessarily a defense to plant patent infringement that the alleged infringing plant is not an asexual reproduction of the patented plant. Part of this proof could be, thus, that the defendant independently developed the allegedly infringing plant. However, the sine qua non is asexual reproduction. That is what the patentee must prove and what the defendant will seek to disprove.

### D. *Conclusion as to Infringement*

■ In this case, therefore, in order for there to be infringement of the '336 patent, the infringing plant must be an asexual reproduction of the plant claimed, i.e., the Heather persoluta shown and described in the '336 patent. The trial court erred as a matter of law when it held that infringement of the '336 patent was shown by proof merely of asexual reproduction of *a* plant having the same essential characteristics as the patented plant. Accordingly, we reverse the holding of infringement. We also therefore vacate the finding of willfulness and the award of attorney fees.

"We recognize that, in some cases, it may be proper for an appellate court which disagrees with a district court's decision granting summary judgment in favor of the moving party, to reverse and remand with instructions to award summary judgment in favor of the nonmoving party." *Litton*, 755 F.2d at 164, 225 USPQ at 38. However, in certain circumstances it is more appropriate to remand to the trial court for further proceedings. *Id.* at 164, 225 USPQ at 38–39 (citations omitted). We believe such circumstances exist here because the trial court did not consider the proper standard for plant patent infringement and, therefore, may not have considered all evidence relevant to the infringement issue. Therefore, we remand to the district court for an infringement determination consistent with this opinion.

### VI. *CONCLUSION*

The judgment of infringement of the '336 patent is reversed. The finding of willfulness

and the award of attorney fees are vacated. The case is remanded for further proceedings consistent with this opinion.

## VII. COSTS

No costs.

*REVERSED–IN–PART, VACATED–IN–PART, AND REMANDED.*