# United States Court of Appeals for the Federal Circuit

---

(Serial Nos. 10/919,574, 10/919,902)

**IN RE WALTER F. BEINEKE**

---

2011-1459, -1460

---

Appeals from the United States Patent and Trademark Office, Board of Patent Appeals and Interferences.

---

Decided: August 6, 2012

---

ALICE O. MARTIN, Barnes & Thornburg, LLP, of Chicago, Illinois, argued for appellant. With her on the brief were JAMES R. BURDETT and RICHARD B. LAZARUS.

RAYMOND T. CHEN, Solicitor, Office of the Solicitor, United States Patent and Trademark Office, of Alexandria, Virginia, argued for appellee. With him on the brief were AMY J. NELSON and NATHAN K. KELLEY, Associate Solicitors.

---

Before DYK, SCHALL, and REYNA, *Circuit Judges*.

DYK, *Circuit Judge*.

Walter F. Beineke ("Beineke") appeals from the decisions of the Board of Patent Appeals and Interferences

("Board") affirming the examiner's rejection of two plant patent applications under 35 U.S.C. § 161. *Ex parte Beineke* ("*2011-1459 Final Decision*"), No. 2010-011045 (B.P.A.I. Mar. 16, 2011); *Ex parte Beineke* ("*2011-1460 Final Decision*"), No. 2010-011047 (B.P.A.I. Mar. 16, 2011). We affirm.

BACKGROUND

The plant patent amendments of 1954 revised what is now 35 U.S.C. § 161 to provide, as it does today, that

> [w]hoever invents or discovers and asexually re-produces any distinct and new variety of plant, *including cultivated sports, mutants, hybrids, and newly found seedlings*, other than a tuber propagated plant *or a plant found in an uncultivated state*, may obtain a patent therefor, subject to the conditions and requirements of this title.

Act of Sept. 3, 1954, Pub. L. No. 83-775, 68 Stat. 1190.

This appeal concerns two plant patent applications filed under section 161 by Beineke for new and distinct oak trees. In the fall of 1980, Beineke noticed two white oak trees ("AFTO-2" and "AFTO-3") in the front yard of a home (not Beineke's own residence) that appeared to display superior genetic traits as compared to other white oak trees, such as excellent timber quality and strong central stem tendency. When first identified by Beineke, AFTO-2 was approximately 118 years old and AFTO-3 was approximately 105 years old. Both trees were 65 feet tall. Beineke planted acorns from each of the trees and, over the next few years, observed the progeny trees. After observing the same superior traits in the progeny trees, Beineke asexually reproduced the trees and found that the reproductions ran true to the originally discovered trees and to each other in all respects. Having concluded

that he had discovered two new and distinct varieties, Beineke applied for plant patents on both trees.

The examiner initially rejected both applications because, inter alia, in his view the statute required that the trees not have been "found in an uncultivated state," and the trees did not satisfy that requirement. In response, Beineke argued to the examiner that the land on which the trees were found was cultivated at the time of discovery, and that was sufficient to meet the requirements of section 161. The examiner then issued final rejections, finding that Beineke did not provide sufficient "factual support for the assertion that the instant tree[s] w[ere] 'in a cultivated state,'" such as "evidence of record describing cultivation of the claimed tree[s], e.g., planting of the tree[s], or maintenance, labor or attention given the claimed tree[s]." 2011-1459 J.A. 129-132; 2011-1460 J.A. 202-205.

A divided Board affirmed the rejection of both applications. After reviewing the legislative history of the statute, the majority focused on the "cultivated" language and concluded that "compliance with the 'cultivated' requirement of § 161 is determined by whether the existence or condition of the found plant itself has been affected by human activity (i.e., cultivation)." *Ex parte Beineke* ("*2011-1459 Initial Decision*"), No. 2007-3882, 2008 WL 2942147, at *4 (July 30, 2008); *Ex parte Beineke* ("*2011-1460 Initial Decision*"), No. 2007-4215, 2008 WL 2951696, at *4 (July 31, 2008).[1] The Board found that the land on which the trees grew had been obtained from the U.S. government in the 1850s but had existed as a wooded

---

[1] Because the Board's initial and final decisions in both appeals are identical in all material respects, this opinion will hereinafter cite only to the 2011-1459 decisions.

pasture until a house was constructed around 1930, long after the trees began growing. The Board also found that there was no evidence that human activity contributed to the creation of the trees, nor was there any evidence of specific efforts made to cultivate the trees after the trees first began to grow. Thus, because "[s]urrounding a tree with a lawn does not change the state of the tree itself," the majority found that the evidence supported the examiner's position that the trees were found in an uncultivated state. *2011-1459 Initial Decision*, 2008 WL 2942147, at *7. Two judges dissented from the majority's interpretation of section 161, stating that they "understand 'cultivated' to be a requirement that the plant be the recipient of human labor only after its discovery," and that they would have found the trees patentable because the trees were cultivated when Beineke discovered them. *Id.* at *13 (dissenting opinion).

Following the decisions, Beineke filed a request for continued examination, and submitted two declarations under 37 C.F.R. § 1.132 to establish that the lawn on which the trees were found "was characteristic of a cultivated lawn," and thus "the tree[s] [were] not 'found in an uncultivated state.'" 2011-1459 J.A. 390; 2011-1460 J.A. 470. After considering the declarations, the examiner again refused to allow the applications, and Beineke appealed to the Board.

An enlarged panel of the Board affirmed the rejections. The majority reiterated that "[t]he evidence . . . supports a conclusion that the acorn[s] that grew into [the trees were] unlikely to have been planted by a human being," and that "neither the Specification[s] nor Appellant's declarations describe any cultivation of the plant[s], before or after a house was built nearby." *2011-1459 Final Decision*, slip op. at 6-7. Indeed, even with the declarations, there was no "evidence showing that the

lawn was in fact watered or fertilized, much less that any watering or fertilization had any effect on the state of [the trees]." *Id.* at 5. Thus, "[t]he evidence of record show[ed] that the claimed oak tree[s] [were] found in an uncultivated state and [were] therefore unpatentable under 35 U.S.C. § 161." *Id.* at 8. One judge concurred in the result, but argued that section 161 was even narrower in that "there must have been some activity by man that resulted in the creation of the parent plant" for a plant to be patentable. *Id.* at 9 (concurring opinion). One judge dissented on the same grounds as in the previous Board appeal, explaining that he thought the majority was incorrect "that a newly found plant . . . requires deliberate planning or cultivation, or must have been the recipient of human labor prior to its discovery, to fall within the scope of § 161." *Id.* at 11 (dissenting opinion). In his view, the trees were patentable because "[t]he tree[s] did not initiate growth in the wild, but rather developed on a homestead, a place of residence, and therefore [are] entitled to patent protection under 35 U.S.C. § 161." *Id.*

Beineke timely appealed from both Board decisions. We consolidated the two appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A).

DISCUSSION

This case presents an issue as to the proper interpretation of 35 U.S.C. § 161. As noted above, this provision permits plant patents to be granted to anyone who "invents or discovers and asexually reproduces any distinct and new variety of plant, including cultivated sports, mutants, hybrids, and newly found seedlings, other than a tuber propagated plant or a plant found in an uncultivated state." We review *de novo* the Board's statutory construction. *In re Giacomini*, 612 F.3d 1380, 1382 (Fed. Cir. 2010).

It is settled that an applicant for a patent under section 161 must establish that the inventor has "recognized [the plant's] uniqueness and difference," *Yoder Bros., Inc. v. Cal.-Fla. Plant Corp.*, 537 F.2d 1347, 1382 (5th Cir. 1976), and has "take[n] the step of asexual reproduction," *Imazio Nursery, Inc. v. Dania Greenhouses*, 69 F.3d 1560, 1566 (Fed. Cir. 1995) (quoting *Yoder Bros.*, 537 F.2d at 1380). The parties do not dispute these requirements. But in other respects, the parties offer quite different interpretations of the statute. Beineke argues that section 161 does not require that the alleged inventor (or other human) have played any role in the creation of the plant, and that finding a new variety of mature plant qualifies the plant for patent protection, assuming post-find cultivation, recognition, and asexual reproduction. The PTO, on the other hand, contends that no plant is patentable unless human activity played a role in the creation of the plant; in the PTO's view, the statute protects only the work of plant breeders who create new varieties of plants either intentionally or by accident. As will be seen, we conclude that neither party is entirely correct, though the PTO's reading of the statute is closer to the correct reading.

We consider first whether the trees are patentable under the language of the original 1930 Plant Patent Act ("1930 Act"), incorporated in the present statute, and second whether they are patentable under the 1954 additions to the plant patent statutes, which have been carried forward in the present statute.

I

As we discuss in detail below, under the 1930 Act, in addition to post-find cultivation, recognition, and asexual reproduction, two things were necessary for an applicant to obtain plant patent protection: (1) the plant must have

been created in its inception by human activity, i.e., it must be the result of plant breeding or other agricultural or horticultural efforts; and (2) the plant must have been created by the "inventor," i.e., the person seeking the patent must have contributed to the creation of the plant in addition to having appreciated its uniqueness and asexually reproduced it. Beineke has not demonstrated that he fulfills either of these requirements.

In 1930, Congress enacted the Plant Patent Act to provide that "[a]ny person . . . who has invented or discovered and asexually reproduced any distinct and new variety of plant, other than a tuber-propagated plant, . . . may . . . obtain a patent therefor." Act of May 23, 1930, Pub. L. No. 71-245, ch. 312, 46 Stat. 376. We must interpret the 1930 Act in light of the "contemporary legal context" in which it was enacted—that is, against the historical backdrop of the patent laws and the existing understanding of the language used in the act at the time. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 698-99 (1979) (holding that the Court's "evaluation of congressional action in 1972 must take into account its contemporary legal context"); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 378 (1982) (holding that in interpreting a statute, the "focus must be on the state of the law at the time the legislation was enacted" and that a court "must examine Congress'[s] perception of the law that it was shaping or reshaping"); *Imazio Nursery*, 69 F.3d at 1564 (holding that "section 161 engrafts the Plant Patent Act onto the basic patent law, which requires us to apply thereto all the rules, regulations, and provisions of the basic patent law" (internal quotation marks omitted)).

Significantly, the 1930 Act crafted the plant patent provisions onto the pre-existing utility patent statute

which included the "invents or discovers" requirement.[2] The 1930 Act's requirement that the applicant must "invent or discover" had an established meaning at the time. The "invents or discovers" language appeared in the first patent act in 1790, *see* Act of Apr. 10, 1790, ch. 7, 1 Stat. 109, 110, and appeared in all subsequent patent statutes.[3] Prior to 1930, the Supreme Court in construing the "invents or discovers" language consistently emphasized that

> [t]he beneficiary [of a patent] *must be an inventor and he must have made a discovery. . . . [I]t is not enough that a thing shall be new, in the sense that in the shape or form in which it is produced shall*

[2] The 1930 act provided:

Any person who has invented or discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvements thereof, *or who has invented or discovered and asexually reproduced any distinct and new variety of plant, other than a tuber-propagated plant,* . . . may . . . obtain a patent therefor.

Act of May 23, 1930, Pub. L. No. 71-245, ch. 312, 46 Stat. 376 (1930 Plant Patent Act additions emphasized). While the plant patent provisions were separated from the utility provisions in the Patent Act of 1952 to create 35 U.S.C. § 161, *see* Pub. L. No. 82-593, ch. 15, 66 Stat. 804 (1952), Congress made clear that this did not change the meaning of the statute, *see* S. Rep. No. 82-1979, at 24 (1952) (explaining, with respect to section 161, only that "[t]he provision relating to plants in the corresponding section of the existing statute is made a separate section"). *See also J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 133 (2001).

[3] *See, e.g.*, Act of July 4, 1836, ch. 357, § 6, 5 Stat. 117, 119 (applying to "any person or persons having discovered or invented any new and useful" invention).

> *not have been before known*, and that it shall be
> useful, but it must, under the constitution and the
> statute, amount to an invention or discovery.

*Thompson v. Boisselier*, 114 U.S. 1, 11 (1885) (emphasis added). In other words, the statute required some "exercise of the inventive faculty." *See Singer Mfg. Co. v. Cramer*, 192 U.S. 265, 276 (1904); *Pearce v. Mulford*, 102 U.S. 112, 118 (1880) (holding that to be entitled to a patent, an improvement "must be the product of some exercise of the inventive faculties"); *Brown v. Piper*, 91 U.S. 37, 41 (1875); *see also Dann v. Johnson*, 425 U.S. 219, 225 (1976) ("As a judicial test, 'invention'—*i.e.*, 'an exercise of the inventive faculty,'—has long been regarded as an absolute prerequisite to patentability." (internal citations omitted)). Other federal courts had also recognized that a patent could not be granted for "mere naked discovery."[4]

Prior to 1930, this view of the invention requirement suggested that plants, being products of nature, were not patentable at all. Judicial decisions reflected a "belief that plants, even those artificially bred, were products of nature for purposes of the patent law." *Diamond v. Chakrabarty*, 447 U.S. 303, 311 (1980); *see also Imazio Nursery*, 69 F.3d at 1563 (explaining that prior to the enactment of the Plant Patent Act, there was a "belief

---

[4]    *In re Kemper*, 14 F. Cas. 286, 288 (D.C. Cir. 1841) ("[N]o discovery will entitle the discoverer to a patent which does not in effect amount to the contrivance or production of something which did not exist before; or, in other words, to an invention."); *see also Morton v. N.Y. Eye Infirmary*, 17 F. Cas. 879, 881 (C.C.S.D.N.Y. 1862) ("In its naked ordinary sense, a discovery is not patentable. . . . It is only where the explorer has gone beyond the mere domain of discovery . . . that he can secure the exclusive control of it under the patent laws.").

that plants, even those bred by man, were products of
nature and therefore not subject to patent protection"").
As recognized in *Chakrabarty*, at the time of the 1930 Act,
decisions of the Commissioner of Patents also reflected
this view.  *See* 447 U.S. at 311.  For example, an 1889
decision by the Commissioner of Patents in *Ex parte
Latimer*, 1889 Dec. Comm'r Pat. 123, exemplified the
then-prevailing understanding of the patentability of
natural products.  In rejecting a patent application on the
fiber from pine needles, the Commissioner explained that

> [i]t cannot be said that the applicant in this case
> has made any discovery, or is entitled to patent
> the idea, or fact, rather, that fiber can be found in
> [pine needles] . . . because the mere ascertaining
> of the character or quality of trees that grow in
> the forest and the construction of the woody fiber
> and tissue of which they are composed is not a
> patentable invention, recognized by the statute,
> any more than to find a new gem or jewel in the
> earth would entitle the discoverer to patent all
> gems which should be subsequently found . . . .
> Otherwise it would be possible for an element or a
> principle to be secured by patent, and the pat-
> entee would obtain the right, to the exclusion of
> all other men, of securing by his new process from
> the trees of the forest . . . the fiber which nature
> has produced and which nature has intended to be
> equally for the use of all men.  *The result would be
> that . . . patents might be obtained upon the trees
> of the forest and the plants of the earth, which of
> course would be unreasonable and impossible.*

*Id.* at 125-26 (emphasis added).  The Commissioner
concluded by explaining that he was "not aware of any
instance in which it has been held that a natural product
is the subject of a patent, although it may have existed

from creation without being discovered." *Id.* at 127; *see also* Harold C. Thorne, *Relation of Patent Law to Natural Products*, 6. J. Pat. Off. Soc'y 23, 27 (1923) (summarizing cases that "[p]roducts of nature are not subject to protection of patents for invention in the United States or in foreign countries").

Congress in 1930 sought to change the existing rule that no plants could be patented while preserving the rule that plants found in nature were not patentable. Plants created by plant breeders were viewed as an "exercise of the inventive faculty" and thus deserving of patent protection. In making this change to protect plant breeders, the 1930 Act also incorporated another fundamental tenant of patent law: that only the "inventor" could secure a patent application based on his own inventive efforts. All early patent statutes reflected the fact that a patent was only available to the true inventor. For example, the very first patent act provided a patent could be granted "upon the petition of any person or persons . . . setting forth, that he, she, or they, hath or have invented or discovered" something new and useful. Act of Apr. 10, 1790, ch. 7, 1 Stat. 109, 110 (permitting patents to be granted to anyone who had "invented or discovered" something that was "sufficiently useful and important"); *see also* Act of July 4, 1836, ch. 357, § 6, 5 Stat. 117, 119 (applying to "any person or persons having discovered or invented any new and useful" invention). The patent act of 1793 required "[t]hat every inventor, before he can receive a patent, shall swear or affirm that he does verily believe, that he is the true inventor or discoverer." Act of Feb. 21, 1793, ch. 11, § 3, 1 Stat. 318, 321. The Supreme Court likewise emphasized the requirement that the inventor must be the one seeking the patent, and that "[n]o one is entitled to a patent for that which he did not

invent." *Agawam Woolen Co. v. Jordan*, 74 U.S. 583, 602 (1868).[5]

The legislative history of the 1930 Act confirms its limited scope. The Senate and House Committee Reports indicated that one of the primary purposes of the bill was to stimulate plant breeding by providing a financial incentive for plant breeders to engage in their work. S. Rep. No. 71-315, at 1-2 (1930); H.R. Rep. No. 71-1129, at 1-2 (1930). Indeed, the reports speak mainly in terms of work to be done by "plant breeders" and "plant developers." *See* S. Rep. No. 71-315; H.R. Rep. No. 71-1129. It is true that the reports do mention in multiple places "discovery" of plants but, as can be seen from various amendments to the bill that ultimately became the 1930 Plant Patent Act (S. 4015, 71st Cong. (1930)), such references refer to a plant breeder's discovery resulting from his own work, and not a "chance find" or discovery of a plant explorer. S. Rep. No. 71-315, at 3-4.

Although not explicitly stated in the statute, Congress was clear that only "*cultivated* sports, mutants, and hybrids [were] included in the bill."[6] S. Rep. No. 71-315,

---

[5] *See also Pointer v. Six Wheel Corp.*, 177 F.2d 153, 157 (9th Cir. 1949) ("[I]t has been held repeatedly that a valid patent can only be granted to the real inventor [and] that the original and first inventor must make the application . . . ."); *Milwaukee v. Activated Sludge*, 69 F.2d 577, 587 (7th Cir. 1934) (holding that "[a] valid patent can be granted only to an actual inventor" and that "[t]he application must be made by the original and first inventor").

[6] At the time of the 1930 Plant Patent Act, a "new and distinct variety" necessarily fell into one of three classes: sports, mutants, and hybrids. *Imazio Nursery*, 69 F.3d at 1565 ("[U]pon passage of the Plant Patent Act, a patentable variety could be either a sport, mutant, or hybrid."). Sports result from bud variation and not seed variation. It occurs when a plant or portion of a plant

at 3 (emphasis added); H.R. Rep. No. 71-1129, at 4. This reference to cultivation reemphasized Congress's understanding that patent protection was available only for plants resulting from human creative efforts by the patent applicant, and not for found plants. Indeed, Congress specifically rejected provisions that would have accorded patent protection to found plants. Before S. 4015 was introduced in 1930, two legislative measures on plant patents, one in each the Senate and House, were introduced the same year. *See* S. 3530, 71st Cong. (1930); H.R. 9765, 71st Cong. (1930). Each of these bills would have included in the plant patent statute language stating explicitly that "the words 'invented' and 'discovered' as used in this section, in regard to asexually reproduced plants, shall be interpreted to include invention and discovery in the sense of *finding a thing already existing* and reproducing the same as well as in the sense of creating." S. 3530, 71st Cong. (1930) (emphasis added); H.R. 9765, 71st Cong. (1930) (emphasis added). Both of these bills were rejected and this language did not make its way into S. 4015.

So too, as initially drafted, S. 4015 would have permitted patents on "any distinct and *newly found variety of plant.*" S. 4015, 71st Cong. § 1 (as introduced by Senate, Mar. 24, 1930) (emphasis added). This provision, however, was stricken from the bill to "eliminate[] from the scope of the bill those wild varieties discovered by the plant explorer or other person who has in no way engaged

---

suddenly assumes a new appearance or characteristic. Mutants result from seedling variation by self-pollenization. Hybrids result from seedlings of cross-pollenization of two different species. Because these sports, mutants, and hybrids will not reproduce true to type on their own, asexual reproduction is necessary to preserve them. S. Rep. No. 71-315, at 3.

in either plant cultivation or care and *who has in no other way facilitated nature in the creation of a new and desirable variety.*" S. Rep. No. 71-315, at 7 (emphasis added). The Senate Report accompanying S. 4015 noted that S. 4015 was "substantially the same as" the previous draft of the bill in the Senate, "except for the elimination of patents for certain newly found plants." S. Rep. No. 71-315, at 3. It was confirmed by the Committee that the final bill "exclu[ded] . . . a wild variety, the chance find of the plant explorer." *Id.* New and distinct plants were patentable only if man "control[led] and direct[ed] the natural processes [to] produce[] a desired result." *Id.* at 6; H.R. Rep. No. 71-1129, at 7.

In rejecting the "newly found" language, the Senate and House Committees were clear that, in accordance with the principles of "invention" as understood at the time, there was a difference between newly found plants and plants created or developed by plant breeders because the plant breeder supplied the necessary inventive faculty. It was explained that

> [t]here is a clear and logical distinction between the discovery of a new variety of plant and of certain inanimate things, such, for example, as a new and useful natural mineral. The mineral is created wholly by nature unassisted by man and is likely to be discovered in various parts of the country; and, being the property of all those on whose land it may be found, its free use by the respective owners should of course be permitted. On the other hand, *a plant discovery resulting from cultivation is unique, isolated, and is not repeated by nature, nor can it be reproduced by nature unaided by man* . . . . It is obvious that nature originally creates plants but it can not be

> denied that man often controls and directs the natural processes and produces a desired result.

S. Rep. No. 71-315, at 6-7 (emphasis added); H.R. Rep. No. 71-1129, at 7 (emphasis added).  The reports go on to analogize the work of a plant breeder to a chemist in that both take advantage of natural principles but nonetheless should be rewarded for the fruits of their labor because they have assisted nature by producing something that nature had not done on its own.  S. Rep. No. 71-315, at 7; H.R. Rep. No. 71-1129, at 7-8.  The same could not be said for a plant explorer discovering a new and distinct plant in the wild.

This history demonstrates that the 1930 Act was not meant to include plants discovered by chance by plant explorers and the like.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." (internal quotation marks omitted)); *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200 (1974) (explaining that a statute should not be interpreted to implicitly include language rejected by Congress).

In short, the provisions of the original 1930 Act, incorporated in the present plant patent statute, provided patent protection to only those plants (e.g., sports, mutants, and hybrids) that were created as a result of plant breeding or other agricultural and horticultural efforts *and* that were created by the inventor, that is, the one applying for the patent.  Beineke meets neither of these requirements.  Beineke does not argue that the oak trees were in any way the result of his creative efforts or indeed anyone's creative efforts, and thus they do not fall within the scope of those plants protected by the 1930 Act.

## II

Neither is Beineke able to demonstrate that the oak trees are eligible for patent protection under the provisions added by the 1954 amendments to the plant patent statutes. Beineke contends that section 161 covers the mature oak trees because Beineke "found" them and they were being cultivated by the owner of the property at the time they were found. But the 1954 amendments only extended patent protection to "newly found seedlings" and did not otherwise alter the scope of plant patent protection for other plant categories. Because Beineke concedes that the oak trees are not newly found seedlings under section 161, Oral Argument at 3:59, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/2011-1459/all, they are not eligible for patent protection.

The amendments to the Plant Patent Act in 1954 revised section 161 to provide, as it does today, that

> [w]hoever invents or discovers and asexually reproduces any distinct and new variety of plant, including cultivated sports, mutants, hybrids, and *newly found seedlings, other than* a tuber propagated plant or *a plant found in an uncultivated state*, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 161 (emphasis added). As we explained in our earlier decision in *Imazio Nursery*, in the 1954 amendments Congress "added another class of plants, newly found seedlings," but made them "subject to the exception that such seedlings found in an uncultivated state cannot be patented." 69 F.3d at 1565.

One of the primary purposes of this amendment was to overrule the Patent Office Board of Appeals decision in

*Ex parte Foster*, 90 U.S.P.Q. 16 (1951). *See* H.R. Rep. No. 83-1455, at 1-2 (1954). In *Foster*, the Board rejected a patent on a new and distinct variety of syngonium plant (apparently a seedling) discovered by a professional plant breeder in a cultivated garden in Colombia. 90 U.S.P.Q. at 17. The Board began by recognizing that "subject matter for patent must be something new in fact, as far as the inventor or discoverer is concerned, in that it must have been created or produced by the inventor or discoverer." *Id.* After reviewing the legislative history of the 1930 Act, the Board concluded that "since Congress in passing the act providing for the patenting of plants specifically intended to exclude plants found or discovered as was the claimed plant, the claim must be rejected." *Id.* at 18.

By legislatively overruling *Foster*, which Congress viewed as a case involving a seedling, Congress sought to extend the statute to provide that "newly found seedlings" found in a cultivated state by the applicant were patentable. These seedlings did not need to have been created by a plant breeder so long as they were discovered by the applicant on cultivated land (such as the garden in *Foster*). The apparent assumption underlying this amendment was that an exception was warranted for newly found seedlings because, the plant having been a seedling at the time of its discovery, it could be assumed that it was cultivated in its inception and that the cultivation of the land by man contributed to its creation.[7]

---

[7] Neither the statute nor the legislative history made clear whether the original cultivator of the land was a co-inventor of the new plant with the individual who identified it as a new variety. In *Ex parte Moore*, 115 U.S.P.Q. 145 (1957), the Board deemed it unnecessary to speculate as to whether the discoverer of the seedling and the land owner were joint inventors.

To be sure, the 1954 amendments also introduced the "cultivated sports, mutants, [and] hybrids" language from the 1930 Act committee reports into section 161. This amendment, however, merely made explicit what was previously implicit—that the 1930 Act protected "sports, mutants, [and] hybrids" "cultivated," that is, created, by the inventor. There is no indication in the text of the amendments or in the legislative history that Congress intended to ignore the longstanding view that, to be patentable, a new and distinct invention (including a new and distinct plant) must be the product or result of man and his inventive efforts. In fact, in 1954, Congress continued to reject the position that a plant that was developed in nature, with no efforts or activity by man, is patentable. Specifically, the Committee Reports conclude by stating that

> [i]t is the considered opinion of those who have studied this matter that a grower of plants who, through no particular efforts of his own other than perhaps by accident, develops a new plant which is, nevertheless, *due to his activity*, should be entitled to patent such plant in the same manner as though he had deliberately planned the result achieved.

S. Rep. No. 83-1937, at 2 (1954) (emphasis added); *see also* H.R. Rep. No. 83-1455, at 1-2. The committee reports also emphasized that the plant patent provisions were intended to cover plants "*discovered by persons engaged in agriculture and horticulture.*" S. Rep. No. 83-1937, at 1 (emphasis added); *see also* H.R. Rep. No. 83-1455, at 2.. Thus, by virtue of the 1954 amendments, Congress extended the plant patent statutes to cover newly found seedlings, but only if they were somehow the result of human activity (i.e., the cultivation of the land on which they originated), and not the chance find of a plant ex-

plorer in the wild.[8] Supreme Court decisions after the 1954 amendments have confirmed this view of the patentability of plants found in nature. As the Supreme Court noted in *Chakrabarty*, "a new mineral discovered in the earth or *a new plant found in the wild is not patentable subject matter*." 447 U.S. at 309 (emphasis added). "Congress thus recognized that the relevant distinction was not between living and inanimate things, but between products of nature, whether living or not, and human-made inventions." *Id*. at 313. The trees, by Beineke's own admission, were not "newly found seedlings," and the trees in question do not fall within the broadened protection of the 1954 amendments.

Because Beineke does not meet the other requirements of section 161 either as originally enacted or as amended in 1954, we need not reach the question of what is meant by "found in an uncultivated state"—that is, we need not determine what level of human cultivation of the area in which a seedling was found at its inception is necessary to satisfy the statute. The Board correctly determined that the mature oak trees found by Beineke in the front yard of a home were not entitled to plant patent protection under section 161.

## AFFIRMED

COSTS

No costs.

---

[8] The 1954 amendments not only made seedlings found on other people's land patentable, but they also established that a seedling found by an applicant on his own land can be patentable even though he did not specifically create it.